**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JONATHAN RITCHIE, Individually and as the Personal Representative of the Estate of Gregory Ritchie, *Plaintiff-Appellant*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *Defendant-Appellee*. | No. 11-16535 <br><br> D.C. No. 1:10-cv-00209-JMS-BMK <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Hawaii
J. Michael Seabright, District Judge, Presiding

Argued and Submitted
June 13, 2013—Honolulu, Hawaii

Filed October 24, 2013

Before: Jerome Farris, Dorothy W. Nelson, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Nguyen;
Concurrence by Judge Farris;
Concurrence by Judge D.W. Nelson

## SUMMARY[*]

### *Feres* Doctrine

The panel affirmed the district court's dismissal under the *Feres* doctrine of a Federal Tort Claims Act wrongful death action brought against the United States.

The plaintiff alleged that officers in the United States Army caused the death of his infant son by ordering his pregnant wife, a servicewoman on active duty, to perform physical training in contravention of her doctor's instructions, which ultimately induced premature labor. The panel held that under the court's own precedent, concerning claims by relatives of military personnel under the "genesis test," the *Feres* doctrine barred plaintiff's wrongful death claim. The panel also held that an "*in utero*" exception to *Feres*, employed by other circuits, did not apply.

Judge Farris concurred in the result.

Judge D.W. Nelson, joined by Judge Nguyen, concurred, and wrote separately to highlight the questionable validity of the *Feres* doctrine.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Eric A. Seitz (argued), Della Au Belatti, and Ronald N.W. Kim, Honolulu, Hawaii, for Plaintiff-Appellant.

Lowell V. Sturgill Jr. (argued), Appellate Staff Attorney, Civil Division, Department of Justice, Tony West, Assistant Attorney General, Florence T. Nakanuki, United States Attorney, Marleigh D. Dover, Appellate Staff Attorney, Washington, D.C., for Defendant-Appellee.

## OPINION

NGUYEN, Circuit Judge:

In this appeal, we again confront the much-maligned *Feres* doctrine, which immunizes the United States from liability for tort claims arising out of activities incident to military service. *Feres v. United States*, 340 U.S. 135 (1950). As with most of our *Feres* jurisprudence, the claims at issue arise from personal tragedy: the premature birth—and immediate death—of Jonathan Ritchie's infant son, Gregory. Ritchie alleges that officers in the United States Army caused Gregory's death by ordering his pregnant wife, a servicewoman on active duty, to perform physical training in contravention of her doctors' instructions, which ultimately induced premature labor. The district court dismissed the action for lack of subject-matter jurisdiction, holding it was barred by *Feres.*

The question before us is whether Ritchie's wrongful death claim against the Army falls within the reach of the *Feres* doctrine. In light of Supreme Court and our own

precedent, we regretfully conclude that it does.  We therefore affirm.

## BACKGROUND

The facts of this case are straightforward and uncontested. Ritchie's complaint alleges that his wife, January Ritchie, was pregnant with their son Gregory while she was serving as a specialist on active duty with the United States Army.  In June 2006, while January was stationed in Missouri, an Army physician created a "pregnancy profile" for her, which imposed a number of restrictions on her activities.  Among other things, it indicated that January should not carry and fire weapons, move with "fighting loads," engage in heavy lifting or physical training ("PT") testing, or run/walk long distances.

January was subsequently transferred to Fort Shafter, Hawaii.  According to the complaint, her supervising officers at Fort Shafter were aware of her pregnancy, but repeatedly disregarded the instructions in her pregnancy profile, forcing her to engage in physical activities such as picking up trash and "battle-focused PT . . . even if she did not feel up to it." Although January protested that she was unable to perform certain tasks due to her pregnancy, her commanding officers ignored her pleas.

On August 7, 2006, January was forced to undergo an emergency cerclage procedure in an effort to prevent premature birth.  Following this procedure, January's doctors specifically informed Army personnel that due to her "high risk" condition, she would be unable to perform her normal work duties for the remainder of her pregnancy.  Her commanding officers, however, continued to disregard her

doctor's instructions that she remain at "relative rest." On August 26, 2006, the Ritchies' son Gregory was born prematurely. He died approximately thirty minutes after birth.

Following the denial of administrative claims, Jonathan Ritchie filed this action in district court on behalf of himself and Gregory's estate, asserting claims under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), for loss of consortium and wrongful death. The district court subsequently dismissed the action for lack of subject matter jurisdiction, reasoning that Ritchie's claims were barred under *Feres*.[1] Ritchie timely appealed.

## STANDARD OF REVIEW

We review de novo a district court's determination that it lacked subject-matter jurisdiction. *Atkinson v. United States*, 825 F.2d 202, 204 (9th Cir. 1987). Further, we "review independently the question whether the *Feres* doctrine is applicable to the facts reflected in the record." *Persons v. United States*, 925 F.2d 292, 294 (9th Cir. 1991) (citation and internal quotation marks omitted).

---

[1] Because the district court concluded that this action was barred under *Feres*, it did not reach the jurisdictional question of whether the claims were filed after the two-year period set out in 28 U.S.C. § 2401(b). *See Mann v. United States*, 399 F.2d 672, 673 (9th Cir. 1968) ("Institution of suit within the two-year period [set forth in 28 U.S.C. § 2401(b)] is a jurisdictional requirement.").

## DISCUSSION

## I.

The FTCA waives the federal government's sovereign immunity, rendering the United States liable "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *see also* 28 U.S.C. § 1346(b)(1). In 1950, however, the Supreme Court carved out a judicial exception to the FTCA, holding in *Feres v. United States* that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. 135, 146 (1950). It subsequently extended this principle—known informally as the "*Feres* doctrine"—in *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666 (1977), to bar third-party claims which derive directly or indirectly from injuries to service members incident to military duty. *See id.* at 673 ("where the case concerns an injury sustained by a soldier while on duty, the effect of the action upon military discipline is identical whether the suit is brought by the soldier directly or by a third party").

The *Feres* doctrine is rooted in three policy rationales:

> (1) the distinctively federal nature of the relationship between the government and members of its armed forces, which argues against subjecting the government to liability based on the fortuity of the situs of the injury; (2) the availability of alternative compensation systems; and (3) the fear of damaging the military disciplinary structure.

*Id.* at 671–72; *Persons v. United States*, 925 F.2d 292, 294–95 (9th Cir. 1991). For the past sixty-three years, the *Feres* doctrine has been criticized by "countless courts and commentators" across the jurisprudential spectrum. *Id.* at 295; *see also United States v. Johnson*, 481 U.S. 681, 700 (1987) (Scalia, J., dissenting) ("*Feres* was wrongly decided and heartily deserves the widespread, almost universal criticism it has received.") (citation omitted); *Costo v. United States*, 248 F.3d 863, 875 (9th Cir. 2001) ("The articulated 'rational bases' for the *Feres* doctrine lead in this case, as in many cases, to inconsistent results that have no relation to the original purpose of *Feres*."). However, neither Congress nor the Supreme Court has seen fit to reverse course.

## II.

### A.

Although the Supreme Court has offered inconsistent guidance about how *Feres* should be applied, *compare United States v. Shearer*, 473 U.S. 52, 57 (1985) (holding that the third rationale should be considered "controlling"), *with Johnson*, 481 U.S. at 689–91 (reaffirming all three rationales), we have consistently emphasized the third rationale: "[t]he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty. . . .'" *Stencel*, 431 U.S. at 671–72 (citations omitted); *see Costo*, 248 F.3d at 866 ("[T]he danger to discipline . . . has been identified as the best explanation for *Feres*."); *Atkinson v. United States*, 825 F.2d 202, 204 (9th Cir. 1987) (indicating that the military discipline rationale is

"determinative"); *Monaco v. United States*, 661 F.2d 129, 132 (9th Cir. 1981) ("[T]he protection of military discipline . . . serves largely if not exclusively as the predicate for the *Feres* doctrine"); *cf. Persons*, 925 F.2d at 295 (observing that our *Feres* "jurisprudence has been guided by an increasing sense of awe for things military").

When considering whether claims by relatives of military personnel are barred by *Feres*, we employ a "genesis test," asking whether the family member's FTCA claim has its "genesis in injuries to members of the armed forces." *Grosinsky v. United States*, 947 F.2d 417, 418 (9th Cir. 1991) (citations omitted). The test originated in *Monaco v. United States*, 661 F.2d 129 (9th Cir. 1981), in which the daughter of a serviceman, Denise Monaco, sued to recover damages under the FTCA for birth defects caused by her father's unwitting exposure to atomic radiation during World War II.[2] *Id.* at 133–34. In holding that her claim was barred under *Feres*, we reasoned:

> Denise's case differs from *Stencel* in that she seeks relief for an injury to herself rather than indemnity for losses due to injury to her father, but this does not change the substantive analysis: *the court still must*

---

[2] The underlying facts of *Monaco* are compelling: During World War II, David Monaco was stationed at the University of Chicago where, as a participant in the Army Specialized Training Program, he was required to exercise at the school's football field. *Id.* at 130. Unbeknownst to him, underneath the stadium was a laboratory in which the government was conducting atomic experiments as part of the "Manhattan Project." *Id.* In addition to giving Monaco colon cancer, the exposure to atomic radiation resulted in genetic abnormalities which caused his daughter to be born with severe birth defects. *Id.*

> *examine the Government's activity in relation
> to military personnel on active duty.* It is
> precisely this type of examination the *Feres*
> doctrine seeks to avoid.

*Id.* at 134 (emphasis added).

Similarly, in *Persons*, we held that the widow and child of serviceman Kelly Persons, who committed suicide while off-duty after having been released from a naval hospital, could not sue the hospital for failing to warn them of Kelly's condition and for loss of consortium. 925 F.2d at 295–97. Relying on *Monaco*, we concluded that these claims "must be viewed as 'derivative' claims, having their genesis in Kelly's service-related death." *Id.* at 297 (citations omitted).[3] And in *Grosinsky v. United States*, 947 F.2d 417 (9th Cir. 1991), we dismissed under *Feres* the claim of a military wife who alleged that an Army surgeon's negligently-performed vasectomy on her serviceman husband resulted in an unanticipated child. *Id.* at 418–19.

Application of these cases compels the same conclusion here. Ritchie alleges that military personnel at Fort Shafter caused Gregory's death by ordering January to engage in military duties against her doctor's recommendations. That

---

[3] In contrast, we held that the Persons' claim for failure to provide adequate counseling was not *Feres*-barred, essentially because there was no causal nexus between the alleged injury and the Navy's purported negligence with respect to Kelly Persons. *See Persons*, 295 F.2d at 298 ("[T]he hospital's alleged breach of its duty [to provide adequate counseling] after the tragedy was completely independent of the purported negligence that led to Kelly's demise. As such, it interrupted the causal chain running from the hospital's purportedly negligent treatment of Kelly Persons and set in motion a new sequence of events.").

Gregory's injury derived from January's military service is, in other words, the core theory of his case. If adjudication of a claim involving an Army trainee's exposure to radiation on a football field in Chicago would improperly require judicial examination of the Army's activity in relation to military personnel, *Monaco*, 661 F.2d at 134, *a fortiori*, a claim challenging military orders given to a servicewoman on active duty likewise cannot escape *Feres*. And, if a claim for failure to warn family members of impending suicide derived from a service-related suicide, *Persons*, 925 F.2d at 297, a claim that military orders caused an infant's wrongful death similarly derives from his mother's military service.

Ritchie attempts to distinguish *Monaco* on two grounds, neither of which is persuasive. First, he suggests that claims based upon genetic injuries differ from claims based upon injuries incurred *in utero* because the former are more purely derivative of injuries to the claimant's servicemember parent. What mattered to the panel in *Monaco*, however, was not merely that Denise's genetic injury derived entirely from injury to her father. Rather, the dispositive factor was that adjudication of her claim would require a court to "examine the government's activity in relation to military personnel on active duty."[4]  *Monaco*, 661 F.2d at 134.

Perhaps recognizing this, Ritchie asserts that adjudication of this matter would not raise the specter of January haling her supervisors into court. Since January is not a named party, he reasons, officers would be questioned in court only

---

[4] Even if Ritchie could distinguish *Monaco* on the grounds that it involved a genetic injury, that still would not get him past *Persons* or *Grosinsky*, which apply the genesis test in the context of medical malpractice and loss of consortium claims.

on *Gregory's* behalf. This argument misses the point. It does not matter if military officers are questioned by counsel for January or questioned by counsel representing Gregory's estate—either way, adjudication of the claim would "involve second-guessing military orders, and would [ ] require members of the Armed Services to testify in court as to each other's decisions and actions." *Stencel*, 431 U.S. at 673; *accord Cole v. United States*, 755 F.2d 873, 878 (11th Cir. 1985) ("[I]t is the need to avoid the *inquiry* into military orders, and not the consequences of the inquiry, that justifies the military exclusion from the FTCA.") (citation omitted).

We can agree with Ritchie about one thing, though: it is unlikely that judicial scrutiny of the orders given to January would have a significant, deleterious effect on our military's operation. After all, we are talking about orders commanding a pregnant woman to engage in physical activities such as picking up trash on a military base, not combat command decisions made in the heat of battle. *Cf. Johnson*, 481 U.S. at 699 (Scalia, J., dissenting) ("I do not think the effect upon military discipline is so certain, or so certainly substantial, that we are justified in holding (if we can ever be justified in holding) that Congress did not mean what it plainly said in the statute before us."). On the other hand, however, given that this case centers on orders given by a military supervisor to his subordinate, it implicates the military discipline rationale of *Feres* in a far more immediate sense than cases involving medical malpractice claims.[5] *See, e.g.*, *Grosinksy*,

---

[5] In a similar vein, we have construed the "incident to service" requirement broadly in non-third party cases applying *Feres*. *See, e.g.*, *Costo v. United States*, 248 F.3d 863, 869 (9th Cir. 2001) (holding that *Feres* barred claims brought by the estates of sailors who drowned during a recreational rafting trip, which had been organized by the Navy).

947 F.2d at 417; *Persons*, 925 F.2d at 294; *Atkinson*, 825 F.2d at 203.

In any event, we are not free to make this judgment call. Absent intervening controlling authority, we are bound by the decisions of prior three-judge panels. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc). And here, the decisions of prior three-judge panels could not be more clear: we have "consistently" barred claims under *Feres* "to avoid examining acts of military personnel which were allegedly negligent with respect to other members of the armed services." *Monaco*, 661 F.2d at 134; *Persons*, 925 at 295 ("[P]ractically any suit that '*implicates* the military judgments and decisions,' runs the risk of colliding with *Feres*.") (citations omitted) (emphasis added). Accordingly, under our own precedent, *Feres* bars Ritchie's wrongful death claim.

## B.

In contending that our precedents are distinguishable, Ritchie focuses on a line of out-of-circuit cases involving allegedly negligent prenatal care at military hospitals, in which courts adopted an "*in utero*" exception to *Feres. See, e.g.*, *Brown v. United States*, 462 F.3d 609, 616 (6th Cir. 2006); *Lewis v. United States*, 173 F. Supp. 2d 52, 56–57 (D.D.C. 2001), *vacated in part on other grounds*, 290 F. Supp. 2d 1 (D.D.C. 2003); *Mossow v. United States*, 987 F.2d 1365, 1369–70 (8th Cir. 1993); *Romero v. United States*, 954 F.2d 223, 226 (4th Cir. 1992); *Del Rio v. United States*, 833 F.2d 282 (11th Cir. 1987). He maintains that the "*in utero*" exception should apply equally here. We disagree.

In contrast to the genesis test applied in our circuit, the "*in utero*" cases turn on whether the purportedly negligent acts caused injury *only* to the civilian fetus, or whether both the fetus and its servicemember parent were injured. Only where a fetus alone suffers injury can the claim survive *Feres*. For instance, in *Romero*, the leading "*in utero*" case, the claimants alleged that an infant's cerebral palsy was caused by a military doctor's failure to place sutures on the cervix of his servicewoman mother during the prenatal period.[6] 954 F.2d at 224. In holding that the infant's FTCA claim was not *Feres*-barred, the Fourth Circuit reasoned that if the sutures had been properly administered, their "sole purpose . . . would have been directed at [the infant] Joshua." *Id.* at 225. Then—without any citation to legal or medical authority—it opined that "[p]resumably [the mother's] state of health would have been the same whether the physician placed the sutures or not." *Id.* The court thus concluded that "[b]ecause no service person was injured [the infant's] claim is not *Feres*-barred." *Id.* at 226.

Similarly, in *Brown*, the Sixth Circuit held that *Feres* did not bar the FTCA claim of Melody Brown, a child born with spina bifida after a military doctor told the child's servicewoman mother to discontinue taking prenatal vitamins while trying to conceive. 462 F.3d at 610–11. The court reasoned that Melody's prenatal injuries were "independent"

---

[6] Like January Ritchie, Roxana Romero had been diagnosed with an "incompetent cervix." *Romero*, 954 F.2d at 224. This condition "occurs when weak cervical tissue causes or contributes to premature birth or the loss of an otherwise healthy pregnancy." Mayo Clinic, *available at http://www.mayoclinic.com/health/incompetent-cervix/DS01198* (last visited October 16, 2013). In practical terms, this means that the cervix may "begin to open too soon—causing [a woman] to give birth too early." *Id.*

of any injury to her mother because prenatal vitamins "would have been [taken] solely for the benefit of the fetus." *Id.* at 615–16.

Contrary to what Ritchie argues, the "*in utero*" exception is inapposite here because, as we previously explained, our analysis is governed by *Monaco* and *Persons*. Absent a principled basis for distinguishing these cases, we must apply the genesis test they expound; we cannot simply substitute another circuit's test for our own.[7] *See Miller*, 335 F.3d at 899–900. Moreover, Ritchie's claim does not easily map onto the "*in utero*" dispensation. While there is undeniably a medical aspect to this case, Ritchie's claim is markedly different from the medical malpractice claims in *Romero*, *Brown*, and the like. The "*in utero*" cases concern medical judgments made by medical personnel at medical facilities; at issue here are military orders given by military supervisors on a military base. This distinction is important because, by challenging orders given by January's military supervisors, Ritchie's wrongful death claim implicates *Feres*'s concern about judicial interference in military personnel matters far more squarely than claims arising from a military doctor's purportedly negligent medical judgment.

In any event, given the facts of this case, it is unlikely that the "*in utero*" exception could save Ritchie's wrongful death claim even if it did apply. Under the test applied by our sister circuits, a civilian fetus's claim may only escape *Feres* if its

---

[7] It is not enough that this case, like the "*in utero*" cases, concerns prenatal injuries. While pregnancy may present unique biological and/or philosophical considerations, *see Atkinson v. United States*, 825 F.2d 202, 207 (9th Cir. 1987) (Noonan, J., concurring), none justify departing from our reasoning in *Monaco* and *Persons*.

servicewoman mother suffered no injury from the purportedly negligent acts. *See Romero*, 954 F.2d at 225–26. A plain reading of the allegations in Ritchie's complaint forecloses such a finding here. Consider again what happened to January. During her second trimester of pregnancy, she was forced to perform physical tasks which caused her considerable pain, even though she told her supervisors that she did not feel well enough to carry out their orders. Due to her pain, she was later taken by ambulance to an emergency room, where her cervix was stitched shut. Her supervisors continued to disregard her doctor's instructions, however, which ultimately induced her premature labor at five-and-half months. And, worst of all, her baby died half an hour after she gave birth. To hold that January was not injured *at all*, as Ritchie urges us to do, requires eschewing common sense and human experience.

## CONCLUSION

We can think of no other judicially-created doctrine which has been criticized so stridently, by so many jurists, for so long. The *Feres* doctrine has generated pained affirmances from this circuit, *e.g.*, *Monaco*, 661 F.2d at 134; *Persons*, 925 F.2d at 297; a forceful dissent by Justice Scalia (joined by Justices Brennan, Marshall, and Stevens), *Johnson*, 481 U.S. at 692–703 (Scalia, J., dissenting); and doctrinal contortions from our sister circuits, *e.g.*, *Romero*, 954 F.2d at 224–25; *Brown*, 432 F.3d at 615–16. Yet, unless and until Congress or the Supreme Court choose to "confine the unfairness and irrationality that [*Feres*] has bred," *Johnson*,

481 U.S. at 703, we are bound by controlling precedent. We therefore regretfully hold that Ritchie's suit is barred by *Feres*.

**AFFIRMED.**

FARRIS, Circuit Judge, concurring:

I concur in the result.

D.W. NELSON, Circuit Judge, with whom NGUYEN, Circuit Judge, joins, concurring:

I concur. I agree that our caselaw bars family member tort claims which have their genesis in injuries a servicemember sustains in the course of her service. *See Persons v. United States*, 925 F.2d 292, 295–97 (9th Cir. 1991); *Monaco v. United States*, 661 F.2d 129, 132–34 (9th Cir. 1981).

I write separately because I wish to highlight how this case reveals the questionable validity of the *Feres* doctrine. Though we hinge our rejection of Ritchie's claims, in part, on the supposed policy rationale that the judiciary should not intrude into military discipline, courts often review military decisions that contradict a military regulation. In these instances, we have held the military accountable to its own standards and its own representations. Yet, here, our *Feres* doctrine dooms any claims for compensation for the harms caused by the military's failure to follow its own regulations

governing pregnant servicewomen. Refusing to compensate a class of victims—servicewomen and their families—based on the fiction that judicial review in these cases will upend "military discipline" perpetuates a grave injustice. It is past time for the judiciary to reconsider its reasons for refusing compensation to servicemembers under the Federal Tort Claims Act (FTCA).

I believe that the third policy rationale underpinning the *Feres* doctrine, preventing judicial interference with "the military discipline structure," *Persons*, 925 F.2d at 295, has no relevance in cases where the military contravenes its own regulations and procedures. This case in particular highlights how this "determinative" and "most persuasive" policy rationale, *see Atkinson v. United States*, 825 F.2d 202, 204 (9th Cir. 1987); *Schoenfeld v. Quamme*, 492 F.3d 1016, 1019 (9th Cir. 2007) (internal quotation marks omitted), has become a guise for denying a selected class— servicemembers—remedies for otherwise judicially-cognizable wrongs.

Of course, there is some sense in restricting judicial interference in discretionary military decision-making where the decisions are "inextricably intertwined with the conduct of the military mission." *United States v. Johnson*, 481 U.S. 681, 691 (1987). Though, I would note this reasoning is not rooted in the common law tradition that allowed servicemembers to bring certain tort claims against their superior officers. *See United States v. Stanley*, 483 U.S. 669, 698–99 (1987) (Brennan, J., dissenting) ("At common law, even military superiors received no exemption from the general rule that officials may be held accountable for their actions in damages in a civil court of law."). Nor is the broad bar of *Feres* supported by the text of the FTCA, which

explicitly excludes only "claim[s] arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war." 28 U.S.C. § 2680(j); *Johnson*, 481 U.S. at 692 (Scalia, J., dissenting) ("The problem now, as then, is that Congress not only failed to provide such an exemption, but quite plainly excluded it."). Unfortunately, the deferential reasoning of *Feres* has created an almost complete bar to servicemembers' tort claims, regardless of whether the facts actually warrant judicial abstention. *See Millang v. United States*, 817 F.2d 533, 535 (9th Cir. 1987) (per curiam). We have described this inflexible and absolute bar as necessary to prevent "the *type* of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness." *Id.* at 535 (quoting *United States v. Shearer*, 473 U.S. 52, 59 (1985) (emphasis in original)).

But that reasoning becomes a fiction in a case such as this, which does not involve discretionary military decision-making and instead involves the military's contravention of its own regulations and procedures. *See Jones v. N.Y. State Div. of Military & Naval Affairs*, 166 F.3d 45, 52 (2d Cir. 1999); *Murphy v. United States*, 993 F.2d 871, 873 (Fed. Cir. 1993); *see also Watkins v. U.S. Army*, 875 F.2d 699, 705–11 (9th Cir. 1989) (en banc) (applying equitable estoppel to enjoin the U.S. Army from denying plaintiff's reenlistment on the basis of his homosexuality); *Bledsoe v. Webb*, 839 F.2d 1357, 1360 (9th Cir. 1988) ("Indeed, courts often review cases in which military officials are alleged to have violated their own regulations."). The *Feres* bar, then, prevents compensation for what would otherwise be judicially-reviewable acts in these cases. *Cf. Wilkins v. United States*, 279 F.3d 782, 784 (9th Cir. 2002) (holding that

"the *Feres* bar does not extend to the claims for non-monetary relief").

Consider Ritchie's factual allegations. The complaint specifically alleges that the military performed the required pregnancy profile for January, but then failed to follow the profile's limited duty requirements, as well as the additional instructions of January's doctor as the pregnancy became high risk. In Ritchie's administrative claim for damages, he elaborates that January "was required to engage in physical exercise and other duties against the advice of her physician resulting in the loss of the pregnancy at twenty-two weeks."

Of course, at some level, these alleged wrongful orders can be viewed as part of "the military discipline structure," since January's refusal to follow them would have been a subordinate's refusal to carry out an order. Yet, this does not mean that the responsible superior officers' decisions to disregard military policy and regulations amount to discretionary, nonjusticiable acts. *See Sterling v. Constantin*, 287 U.S. 378, 401 (1932) ("What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions."). Quite the contrary, military decisions, carried out through the orders of military officers, that contravene military policies and regulations are judicially reviewable. *See Wenger v. Monroe*, 282 F.3d 1068, 1072 (9th Cir. 2002). Moreover, the military's policies and actions towards pregnant servicewomen are not discretionary, but rather, are clearly matters the judiciary has jurisdiction to consider. *See, e.g.*, *Crawford v. Cushman*, 531 F.2d 1114 (2d Cir. 1976) (invalidating on constitutional grounds the Marine Corps' regulation which mandated the discharge of Marines for pregnancy).

Here, the relevant Army regulation, AR 40-501, Chapter 7-9, requires that pregnant soldiers have a "pregnancy profile," which includes a mandatory "occupational health interview to assess risks to the Soldier and fetus." The regulation specifically directs commanders to "counsel all female Soldiers as required by AR 600-8-24 or AR 635-200"; "consult with medical personnel as required"; and "establish[] liaison with the occupational health clinic and request[] site visits by the occupational health personnel if necessary to assess any work place hazards." AR 40-501, Chapter 7-9(b)(3). The regulation then sets forth twelve specific limitations on the duties of pregnant soldiers during the term of their pregnancy, including scheduled mandatory rest periods, adding additional restrictions as the gestation period progresses. *Id.* at 7-9(d). For instance, "[a]t 28 weeks of pregnancy, the Soldier must be provided a 15-minute rest period every 2 hours." *Id.* Thus, when Ritchie alleges that "Officers, members, and/or employees of the United States Army" disregarded the pregnancy profile and the instructions of January's doctor, Ritchie is alleging that the Army failed to follow its own policies regulating the treatment of pregnant women.

This case reveals the injustice caused by the *Feres* doctrine. Our jurisprudence allows us to consider claims challenging the military's failure to follow its own mandatory regulations, but only when the plaintiff requests declaratory or injunctive relief. *See Wilkins*, 279 F.3d at 787; *Wenger*, 282 F.3d at 1072. But that relief is often meaningless. *See Stanley*, 483 U.S. at 690 (Brennan, J., dissenting) ("An injunction, however, comes too late for those [soldiers] already injured; for these victims, it is damages or nothing.") (internal quotation marks omitted). An injunction can never remedy the injuries here—January's preterm labor and

Gregory's death. In fact, each time the military fails to follow regulations that result in harm to the mother and fetus, the injured parties will have no recourse because a forward-looking remedy cannot make them whole. Our current jurisprudence, then, acknowledges that pregnant servicewomen have a right to have the military abide by its regulations restricting their duty to medically-set limits, but yet affords them no remedy at law to ensure compliance.

Pregnant women did not always have the right to serve in the Armed Forces; this right was hard-earned. *See* Exec. Order No. 10240, 16 Fed. Reg. 3689 (May 1, 1951) (giving the services permission to discharge a woman if she became pregnant, gave birth to a child, or became a parent by adoption or a stepparent); *Crawford*, 531 F.2d 1114. Efforts to exclude pregnant women from serving, and even to punish women for becoming pregnant, continue to this day. *See Pregnant G.I.'s Could Be Punished*, Associated Press, Dec. 19, 2009, *available at* http://www.nytimes.com/2009/12/20/us/20general.html. The right a pregnant woman has to serve means little if her service requires she put her fetus's health and well-being at risk. In refusing to recognize Ritchie's tort claims, we are continuing the legal fiction that these alleged wrongs are part of the military's discipline structure. To hold that these kinds of tortious acts against a pregnant servicewoman are per se judicially unreviewable because they are part of the military mission is to practice willful blindness at the expense of a woman's livelihood and the life of her unborn child. I am resigned that the unfortunate cases applying the *Feres* doctrine dictate such an outcome, but I sincerely doubt that the conduct alleged here—orders contravening military regulations intended to protect pregnant servicewomen—warrant judicial deference of any kind. Where military conduct passes "so far beyond

the bounds of human decency," I do not believe that it can be considered a part of the military mission. *Stanley*, 483 U.S. at 709 (O'Connor, J., concurring & dissenting). It is a judicial fallacy which we have created and which I hope will be overturned one day soon.